UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:16-CR-20341-UU-1



UNITED STATES OF AMERICA

V.

ALBERT MATHIS FIREBAUGH IV
        DEFENDANT/PETITIONER.
_____/

PETITIONER'S DECLARATION IN SUPPORT OF
PETITIONER'S REPLY TO THE GOVERNMENT'S
LATE FILED OPPOSITION TO THE PETITION
FOR COMPASSIONATE RELEASE.

I, ALBERT MATHIS FIREBAUGH IV, PETITIONER, PRO SE, STATE THAT THE FACTS AND INFORMATION PRESENTED BELOW ARE TRUE AND CORRECT TO THE BEST OF MY ABILITY AND STATED UNDER PENALTY OF PERJURY.

1

1. ON MARCH 24, 2020, I SENT MY REQUEST FOR COMPASSIONATE RELEASE TO TO WARDEN ANDREWS THROUGH MY UNIT TEAM MANAGER, Ms. VUKELICH, AS IS ESTABLISHED POLICY OF FCC PETERSBURG.

2. ON OR ABOUT APRIL 28, 2020, I SENT TO WARDEN ANDREWS, A COP-OUT REQUESTING A COPY OF THE REQUEST FOR COMPASSIONATE RELEASE I SENT TO THE WARDEN ON MARCH 24, 2020.

3. ON MAY 13, 2020, I RECEIVED THE DENIAL OF MY REQUEST FOR COMPASSIONATE RELEASE, WHICH INDICATES THAT THE WARDEN SIGNED IT ON MAY 5, 2020. I SENT A COPY OF THE LATE DENIAL TO THE COURT.

4. I HAVE HAD A LOT OF TIME TO REFLECT UPON MY ACTIONS. I HAVE COME TO REALIZE THAT THROUGH MY ACTIONS AND INACTIONS, I HAVE HARMED MANY INNOCENT PEOPLE.

I AM EXTREMELY APOLOGETIC TO THE VICTIMS DEPICTED IN THE IMAGES AND THE REPEATED HORROR THAT HAUNTS THEM AND WILL FOREVER HAUNT ME.

I HAVE COME TO REALIZE THAT I VIOLATED AND ABUSED THE TRUST OF MY FAMILY, FRIENDS, CO-WORKERS, AND MY COMMUNITY THAT I SERVED. THE NEGATIVE IMPACT I CAUSED CAN NEVER BE PROPERLY REPAID. I CAN ONLY MOVE FORWARD WITH A DIFFERENT OUTLOOK AND MEANING TO MY LIFE WHILE RESOLVING TO TAKE ADVANTAGE OF THE SECOND OPPORTUNITY TO RISE ABOVE THE INDIFFERENT POSTURE OF MY PAST.

I DO NOT INTEND TO ASK THIS COURT TO POTENTIALLY SAVE MY LIFE BY GRANTING MY REQUEST FOR COMPASSIONATE RELEASE, ONLY TO THEN GIVE IT AWAY AGAIN IN SOCIETY.

5. I ENROLLED IN RDAP TO HELP ME UNDERSTAND MY ABUSE OF ALCOHOL LEADING UP TO MY INCARCERATION. I FOUND THE WORKBOOKS AND SMALL GROUP THERAPY HELPFUL. HOWEVER, I WAS EXTREMELY UNCOMFORTABLE AS I HAD NEVER LIVED WITH DRUG DEALERS AND HEAVY NARCOTICS ADDICTS. THERE WAS A DEFINATE CULTURAL AND SOCIALECCONOMIC GAP I WAS LEARNING TO DEAL WITH.

I WAS DROPPED FROM THE PROGRAM MAINLY BECAUSE I DIDN'T FIT IN. THE REASONS GIVEN FOR MY DISMISSAL WERE THAT I USED THE BATHROOM AFTER OUR UNIT WAS COUNTED BUT BEFORE THE OFFICAL COMPOUND WAS CLEARED; GOING TO A MEDICAL CALLOUT DURING A GROUP EXERCISE; AND ON ONE OCCASION, I UTTERED A "NAUGHTY WORD."

6. ATTACHED HERETO IS A TRUE AND CORRECT COPY OF THE DECLARATION OF

4

CHRIS BEYER, MD, MPH, PROFESSOR OF EPIDEMIOLOGY, JOHNS HOPKINS BLOOMBERG SCHOOL OF PUBLIC HEALTH, BATIMORE, MARYLAND. THE DECLARATION WAS ORIGINALLY FILED IN THE CASE OF U.S. v. FAUNTLEROY, CCB-10-0336, DISTRICT COURT OF MARYLAND, MARCH 2020.

I MAKE THE ABOVE STATEMENTS UNDER PENALTY OF PERJURY.

_____
ALBERT MATHIS FIREBAUGH IV
DEFENDANT/PETITIONER

MAY 23, 2020
DATED

Declaration for Persons in Detention and Detention Staff
COVID-19

Chris Beyrer, MD, MPH
Professor of Epidemiology
Johns Hopkins Bloomberg School of Public Health
Baltimore, MD

I, Chris Beyrer, declare as follows:

1. I am a professor of Epidemiology, International Health, and Medicine at the Johns Hopkins Bloomberg School of Public Health, where I regularly teach courses in the epidemiology of infectious diseases. This coming semester, I am teaching a course on emerging infections. I am a member of the National Academy of Medicine, a former President of the International AIDS Society, and a past winner of the Lowell E. Bellin Award for Excellence in Preventive Medicine and Community Health. I have been active in infectious diseases Epidemiology since completing my training in Preventive Medicine and Public Health at Johns Hopkins in 1992.

2. I am currently actively at work on the COVID-19 pandemic in the United States. Among other activities I am the Director of the Center for Public Health and Human Rights at Johns Hopkins, which is active in disease prevention and health promotion among vulnerable populations, including prisoners and detainees, in the US, Africa, Asia, and Latin America.

### The nature of COVID-19

3. The SARS-nCoV-2 virus, and the human infection it causes, COVID-19 disease, is a global pandemic and has been termed a global health emergency by the WHO. Cases first began appearing sometime between December 1, 2019 and December 31, 2019 in Hubei Province, China. Most of these cases were associated with a wet seafood market in Wuhan City.

4. On January 7, 2020, the virus was isolated. The virus was analyzed and discovered to be a coronavirus closely related to the SARS coronavirus which caused the 2002-2003 SARS epidemic.

5. COVID-19 is a serious disease. The overall case fatality rate has been estimated to range from 0.3 to 3.5%, which is 5-35 times the fatality associated with influenza infection. COVID-19 is characterized by a flu-like illness. While more than 80% of cases are self-limited and generally mild, overall some 20% of cases will have more severe disease requiring medical intervention and support.

6. The case fatality rate varies significantly depending on the presence of certain demographic and health factors. The case fatality rate is higher in men, and varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardio-vascular disease, respiratory disease, diabetes, and immune compromise.

7. Among patients who have more serious disease, some 30% will progress to Acute Respiratory Distress Syndrome (ARDS) which has a 30% mortality rate overall, higher in those with other health conditions. Some 13% of these patients will require mechanical

16. In addition to the nature of the prison environment, prison and jail populations are also at additional risk, due to high rates of chronic health conditions, substance use, mental health issues, and, particularly in prisons, aging and chronically ill populations who may be vulnerable to more severe illnesses after infection, and to death.

17. While every effort should be made to reduce exposure in detention facilities, this may be extremely difficult to achieve and sustain. It is therefore an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible.

18. Pre-trial detention should be considered only in genuine cases of security concerns. Persons held for non-payment of fees and fines, or because of insufficient funds to pay bail, should be prioritized for release. Immigrants awaiting decisions on their removal cases who are not a flight risk can be monitored in the community and should be released from immigration detention centers. Older inmates and those with chronic conditions predisposing to severe COVID-19 disease (heart disease, lung disease, diabetes, immune-compromise) should be considered for release.

19. Given the experience in China as well as the literature on infectious diseases in jail, an outbreak of COVID-19 among the U.S. jail and prison population is likely. Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of March, 2020.

*[signature]*

Professor Chris Beyrer[1]

---

[1] These views are mine alone; I do not speak for Johns Hopkins University or any department therein.

ALBERT MATHIS FIREBAUGH III    09206-104
PETERSBURG LOW
FEDERAL CORRECTIONAL INSTITUTION
INMATE MAIL/PARCELS
POST OFFICE BOX 1000
PETERSBURG, VA 23804

LEGAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
OFFICE OF THE CLERK ROOM 8N09
400 NORTH MIAMI AVENUE
MIAMI, FLORIDA 33128-7716


